UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

CHAD M. FARRELL,

    Plaintiff,

    v.

DAWN BUSS, et al.,

    Defendants.

CAUSE NO.: 3:22-CV-66-JD-MGG

OPINION AND ORDER

Chad M. Farrell, a prisoner without a lawyer, filed an "objection" to the court's fee order. (ECF 11.) In effect, he finds it unfair that the court would grant him leave to proceed in forma pauperis, and at the same time require that he pay the filing fee in installments over time. He asks the court to reconsider its order and waive the fee.

Because Mr. Farrell is a prisoner, the filing of the complaint triggered an obligation to pay the entire filing in accordance with the procedures set forth in the Prison Litigation Reform Act ("PLRA"). 28 U.S.C. § 1915(b)(1) ("[I]f a prisoner brings a civil action or files an appeal in forma pauperis, the prisoner shall be required to pay the full amount of a filing fee."). Under the statute, he is required to pay an initial partial filing fee calculated in accordance with 28 U.S.C. § 1915(b)(1), and thereafter to "make monthly payments of 20 percent of the preceding month's income credited to the prisoner's account . . . each time the amount in the account exceeds $10 until the filing fees are paid." 28 U.S.C. § 1915(b)(2). The court does not have authority to waive the fee or modify the amount or timing of payments. *Lucien v. DeTella*, 141 F.3d 773, 776 (7th

Cir. 1998). Although he states that he has other monthly expenses, such as buying supplies for his cat, "like any other civil litigant, [he] must decide which of his legal actions is important enough to fund." *Lindell v. McCallum*, 352 F.3d 1107, 1111 (7th Cir. 2003); *see also Lucien*, 141 F.3d at 776 (a prisoner is not entitled to prioritize personal spending over payment of filing fees). The motion will be denied.

Because the initial partial filing fee has now been paid, the case can proceed to screening. Under 28 U.S.C. § 1915A, the court must screen the complaint and dismiss it if it is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief. To proceed beyond the pleading stage, a complaint must contain sufficient factual matter to "state a claim that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Because Mr. Farrell is proceeding without counsel, the court must give his allegations liberal construction. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

Mr. Farrell is an inmate at Indiana State Prison ("ISP"). He alleges that on April 9, 2020, he was working as a "suicide companion" for another inmate. He does not clearly explain what this means, but it can be discerned from context that the prison hires inmate workers to provide assistance in monitoring inmates who are on suicide watch. Mr. Farrell claims that on the date in question, the inmate he was monitoring, whom he identifies as "Tate," became angry at him and threw a Styrofoam cup

containing urine at him, getting urine on his body and clothing. Mr. Farrell claims that Assistant Warden Dawn Buss knew prior to this that inmates on suicide watch were prone to throwing bodily waste on their companions, and that she had promised to install plexiglass dividers to prevent such an attack, but had not done so.[1]

After Tate threw urine on Mr. Farrell, he reported to Lieutenant Winn (first name unknown) what had occurred. The lieutenant told him that he could go "get cleaned up." It can be discerned that Mr. Farrell was supposed to write down in a log book what had occurred, but he did not do that before going to take a shower. He states he was "more concerned with getting the urine off than writing on the log sheet." He assumed that after he finished showering, he would be permitted to return to the area to complete the necessary paperwork. That did not occur, however, because shortly after he got out of the shower, he was told by a guard that another inmate would be sent to monitor Tate "so Farrell would not retaliate against Tate."

Mr. Farrell was subsequently told that he was being fired from his job because he had "walked off" his work assignment. He claims he confronted Assistant Warden Buss about this a few days later and she told him "you're fired and there's nothing more to say you walked out." He claims Assistant Warden Buss engaged in fraud, violated prison policies, and committed various criminal offenses in her investigation of this incident, because she did not talk to Lieutenant Winn or others who were involved and

---

[1] He claims Tate was planning to throw feces on him the following day, but officers discovered Tate's plan and removed cups containing feces from his cell.

3

refused to give him a lie detector test when he requested one. As a result of the loss of his job, he was removed from the "honor" dorm, and in the process of being moved, his X-box, 27 games, and accessories went missing. He claims that in his new housing assignment, another inmate tried to kill his cat, Saphira, because he did not like cats. Mr. Farrell claims that Assistant Warden Buss put Saphira "in harm's way to cover up her negligence" in failing to install the plexiglass dividers.

He further claims that he talked to "Poncho," who he identifies as a "caseworker manager," about the incident with Tate and his subsequent termination. After investigating, Poncho informed Mr. Farrell that Tate would be written up for throwing bodily waste on him. Mr. Farrell believes Poncho did not do enough to "stand up" for him and help him get his job back. He also believes Poncho should have intervened before this incident occurred because Poncho was allegedly aware that inmates on suicide watch had Styrofoam cups, which Mr. Farrell claims was a violation of prison policy. He further alleges that he talked to Lieutenant Moon (first name unknown) about his termination, and the lieutenant allegedly told him that "no one will go against Buss." He wanted the lieutenant to put this statement in writing, but the lieutenant never gave him a written statement or helped him get his job back.

He also claims that Dr. Verdon (first name unknown), the head of the prison's psychiatry department, is an "accessory to the assaults" on suicide companions because she was allegedly aware that inmates on suicide watch were being given Styrofoam cups in violation of prison policy. He further claims that Dr. Verdon did a poor job of training suicide companions, and that during a training session the doctor maligned

4

inmates on suicide watch by stating that many of them were faking. He also claims in very general terms that Dr. Verdon "never should have taken Farrell's medication," which in his view could have caused him to "have a psychotic break from having over fourteen concussions and irreversible brain damage."

Mr. Farrell further asserts that Warden Ron Neal is liable for "aiding and abetting" Assistant Warden Buss in her mishandling of the investigation of the incident, because he "refused to correct the travesty" when Mr. Farrell told him what occurred. He likewise claims that Mark Newkirk, a classification official at the Indiana Department of Correction ("IDOC"), did not properly investigate the incident and allowed him to be removed from the honor dorm. He also claims that IDOC Commissioner Robert Carter failed to "step in and correct the corruption" at ISP, even though he wrote the Commissioner several letters after this incident. He claims that J. Wallen, the grievance specialist at ISP, mishandled his grievances related to the loss of his job and his move out of the honor dorm.

He also includes claims regarding the missing X-box. Specifically, he alleges that after his X-box went missing, he asked Mr. Garcia (first name unknown), an employee in the prison commissary, for a copy of his "registration" for the gaming system. Mr. Garcia allegedly responded that he could not give him a copy of the registration because prison records showed the X-box was "no longer in Farrell's name." Mr. Farrell claims this is a lie because he never gave his X-box to anyone. He further claims that Mr. Garcia put him in danger by falsely telling other inmates that he had filed a theft report for the X-box. He believes Mr. Garcia did this because Mr. Farrell threatened to sue him.

5

Likewise, he claims that Major Wardlow (first name unknown) also searched for the missing X-box, and told other inmates (who were apparently in possession of the X-box at that time) that Mr. Farrell had reported the X-box stolen. He believes this too was retaliatory. He asserts that the statements of these defendants led other inmates to believe that he had "snitched" on them, which in turn caused them to threaten violence against him and his cat.

Based on these events, he sues Assistant Warden Buss, Warden Neal, Tate, Poncho, Mr. Newkirk, IDOC, Mr. Garcia, Lieutenant Moon, Dr. Verdon, Mr. Wallen, Commissioner Carter, and Major Wardlow. He seeks one million dollars in damages from each defendant, a letter of apology, the return of his X-box, a court order preventing him and his cat from being transferred again, and "each defendant charged with a crime."

The Eighth Amendment imposes a duty on prison officials "to take reasonable measures to guarantee the safety of inmates" and to "protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994). However, "prisons are dangerous places," as "[i]nmates get there by violent acts, and many prisoners have a propensity to commit more." *Grieveson v. Anderson*, 538 F.3d 763, 777 (7th Cir. 2008). Therefore, a failure-to-protect claim cannot be predicated "merely on knowledge of general risks of violence in a detention facility." *Brown v. Budz*, 398 F.3d 904, 913 (7th Cir. 2005). Instead, the plaintiff must establish that "the defendant had actual knowledge of an impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to

6

prevent it." *Santiago v. Wells*, 599 F.3d 749, 756 (7th Cir. 2010). This is a high standard. As the Seventh Circuit has explained:

> To establish deliberate indifference on the part of the defendants sued individually, [plaintiff] needed to show that the officers acted with the equivalent of criminal recklessness, in this context meaning they were actually aware of a substantial harm to [plaintiff's] health or safety, yet failed to take appropriate steps to protect him from the specific danger. [Plaintiff] testified during his deposition that he told officers twice . . . that he was afraid for his life and he wanted to be transferred off the tier. . . . This lack of specificity falls below the required notice an officer must have for liability to attach for deliberate indifference.

*Klebanowski v. Sheahan*, 540 F.3d 633, 639-40 (7th Cir. 2008) (internal citations and footnote omitted).

It is unfortunate that Mr. Farrell had urine thrown on him, but he does not plausibly allege that any defendant had knowledge of a specific risk to his safety from a specific inmate and consciously disregarded that risk. *Id.* at 640. He does not allege that he warned anyone in advance that Tate was going to throw urine on him, and indeed, the incident seems to have been a surprise to him too. It appears to have been a random act of violence resulting from another inmate telling Tate—falsely, according to Mr. Farrell— that Mr. Farrell told medical staff Tate had been eating during a hunger strike. In a similar case, an inmate was attacked by other inmates for "taking too long to use the toilet" and for snoring during the night. *Grieveson*, 538 F.3d at 776–77. The Seventh Circuit observed that such random violence demonstrated "the tragic realities of jail and prison life that detainees are often subject to, absent fault on the part of individual jail [staff]." *Id.*

Although Mr. Farrell claims that Assistant Warden Buss was aware of a general risk that suicide companions could be assaulted by bodily waste, a failure-to-protect claim cannot be predicated "merely on knowledge of general risks of violence in a detention facility." *Brown*, 398 F.3d at 913. He believes that Assistant Warden Buss was "negligent" in not installing plexiglass prior to this incident, and that Poncho and Dr. Verdon should have done more to have Styrofoam cups confiscated from inmates on suicide watch, but "negligence, gross negligence, or even recklessness as the term is used in tort cases is not enough" to establish an Eighth Amendment violation.[2] *Hildreth v. Butler*, 960 F.3d 420, 425–26 (7th Cir. 2020). Nor does making a "mistake" or exercising "poor judgment" satisfy the deliberate indifference standard. *Giles v. Tobeck*, 895 F.3d 510, 514 (7th Cir. 2018). The omissions he attributes to these defendants cannot be said to "cross the line from negligently enabling the attack to recklessly condoning it." *Id.*

He also sues these defendants for conducting a poor investigation into the incident with Tate, leading to his termination from his prison job and his removal from the honor dorm. The Fourteenth Amendment provides that state officials shall not "deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. That said, due process is only required when punishment extends the duration of confinement or imposes "an atypical and significant hardship… in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484

---

[2] The court considers that inmates on suicide watch have their own constitutional rights, including the right to adequate food and drinking water. *Thomas v. Blackard*, 2 F.4th 716, 719 (7th Cir. 2021);

8

(1995). Termination from a prison job, the loss of privileges, or a transfer to a less desirable location do not trigger due process protections. *Cochran v. Buss*, 381 F.3d 637, 641 (7th Cir. 2004) (claims that inmate "lost his preferred prison living arrangement, his prison job and his eligibility for rehabilitative programs" were not significant enough to trigger due process concerns); *DeTomaso v. McGinnis*, 970 F.2d 211, 212 (7th Cir. 1992) ("prisoners possess neither liberty nor property in their classifications and prison assignments"). Thus, Mr. Farrell's allegations related to his termination from his prison job and removal from the honor dorm do not state a plausible due process claim.[3]

His allegation that the grievance specialist mishandled his grievances about these issues also does not give rise to a cognizable constitutional claim. *Daniel v. Cook Cty.*, 833 F.3d 728, 736 (7th Cir. 2016) (the Constitution does not require that prisons provide a grievance procedure, and the existence of an internal grievance procedure does not create any constitutionally guaranteed rights). To the extent he is claiming that prison policies were not followed, a violation of prison policy cannot form the basis for a claim under 42 U.S.C. § 1983. *See Sobitan v. Glud*, 589 F.3d 379, 389 (7th Cir. 2009) ("By definition, federal law, not state law, provides the source of liability for a claim alleging the deprivation of a federal constitutional right."); *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003) ("42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not

---

[3] He makes a cursory reference to "equal protection," but prisoners are not a suspect class, and to state a claim he "had to allege facts that suggest he was intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Fields v. Miller*, No. 21-1419, 2022 WL 1011666, at *2 (7th Cir. Apr. 5, 2022) (citation and internal quotation marks omitted). "Even at the pleading stage, a plaintiff's allegations must eliminate any reasonably conceivable state of facts that would show a logical connection between the different treatment and a legitimate government interest." *Id.* Mr. Farrell has not satisfied this standard.

9

violations of state laws"). Nor does he have authority to initiate criminal charges against any of the defendants, which is the purview of state and federal law enforcement officials. *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[I]n American jurisprudence . . . a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."); *United States v. Palumbo Bros., Inc.*, 145 F.3d 850, 865 (7th Cir. 1998) ("[C]riminal prosecution is an executive function within the exclusive prerogative of the Attorney General.").

He also lists the IDOC as a defendant, but this state agency is not a "person" that can be sued for constitutional violations under 42 U.S.C. § 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70 (1989). Likewise, any claim for damages against the IDOC is barred by the Eleventh Amendment. *de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 565 (7th Cir. 2019). He also names Tate as a defendant, but a private individual cannot be sued for constitutional violations under 42 U.S.C. § 1983. *L.P. v. Marian Catholic High Sch.*, 852 F.3d 690, 696 (7th Cir. 2017).

As to his claims against Mr. Garcia and Major Wardlow about the X-box, the court concludes that they are not sufficiently related to his assault-with-bodily-waste and job-loss claims to proceed in the same lawsuit. Unrelated claims against different defendants belong in different lawsuits. *George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007). As the Seventh Circuit has explained:

> A buckshot complaint that would be rejected if filed by a free person—say, a suit complaining that A defrauded the plaintiff, B defamed him, C punched him, D failed to pay a debt, and E infringed his copyright, all in different transactions—should be rejected if filed by a prisoner. . . . M]ultiple claims against a single party are fine, but Claim A against

10

> Defendant 1 should not be joined with unrelated Claim B against
> Defendant 2. Unrelated claims against different defendants belong in
> different suits.

*George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007); *see also Owens v. Evans*, 878 F.3d 559, 566 (7th Cir. 2017) (observing that plaintiff's "scattershot strategy" of filing an "an omnibus complaint against unrelated defendants . . . is unacceptable"). Particular care must be taken in the case of prisoner-plaintiffs to ensure that they are not permitted to lump unrelated claims together in one lawsuit so as to avoid the provisions of the PLRA. *See Henderson v. Wall*, No. 20-1455, 2021 WL 5102915, at *1 (7th Cir. Nov. 3, 2021).

Mr. Farrell's claims about the search for his missing X-box and his allegedly being labeled a snitch by Mr. Garcia and Major Wardlow in retaliation for threatening to sue them are factually and legally distinct from his claims about the assault by Tate and the loss of his job. He can assert the claims in another lawsuit if he chooses, but not in this case. Likewise, he makes a cursory allegation that Dr. Verdon improperly discontinued some medication he had been taking prior to his incarceration. The denial of adequate medical care for a serious medical need could give rise to Eighth Amendment concerns. *Thomas v. Blackard*, 2 F.4th 716, 722 (7th Cir. 2021). But the court does not find a claim about the alleged denial of medical care for a psychiatric problem sufficiently related to Mr. Farrell's assault-with-bodily waste and job-loss claims to proceed in the same lawsuit. He can assert the claim in another lawsuit, but not this one. These claims will be dismissed without prejudice.

Therefore, the complaint does not state a claim upon which relief can be granted. The bulk of his allegations do not state a plausible constitutional claim, and his

11

unrelated claims must proceed in a different lawsuit. The court notes that this is Mr. Farrell's third attempt to articulate his claims. His first complaint was not properly signed in accordance with Federal Rule of Civil Procedure 11, and his second one did not comply with the Local Rules or Federal Rule of Civil Procedure 8. (ECF 3, 7.) Nevertheless, in the interest of justice, the court will allow him one final opportunity to amend his complaint if, after reviewing the court's order, he believes that he can state a plausible constitutional claim related to his assault with bodily waste by Tate and the loss of his prison job, consistent with the allegations he has already made under penalty of perjury. *See Abu-Shawish v. United States*, 898 F.3d 726, 738 (7th Cir. 2018); *Luevano v. Wal-Mart*, 722 F.3d 1014, 1024 (7th Cir. 2013).

For these reasons, the court:

(1) DENIES the plaintiff's motion to object to filing fee (ECF 11);

(2) GRANTS the plaintiff until **May 19, 2022**, to file an amended complaint if he so chooses; and

(3) CAUTIONS him that if he does not respond by the deadline, this case will be dismissed pursuant to 28 U.S.C. § 1915A because the current complaint does not state a claim upon which relief can be granted.

SO ORDERED on April 20, 2022

/s/JON E. DEGUILIO
CHIEF JUDGE
UNITED STATES DISTRICT COURT